We'll hear argument first this morning in Case 15-118, Hernandez v. Mesa. Mr. Hilliard. Mr. Chief Justice, and may it please the Court, 15-year-old Sergio Hernandez was standing in Mexico, barely across the border, unthreatening and unarmed, when he was shot and killed by a U.S. Border Patrol agent standing inside the United States. This tragic case is one of the most simplest extraterritorial cases this Court will ever have in front of it for five reasons. First, all of the conduct of the domestic police officer happened inside the United States. Second, it was a civilian domestic police officer. Third, it was a civilian plaintiff, not an enemy combatant. Fourth, it was one of the most fundamental rights, the right to life. Fifth, the other reason was that the U.S. Border Patrol agent was a civilian domestic police officer.  police officer. So what's the claim? Kagan. So is that – I was trying to figure out from your brief what exactly your rule is. So are all five of those necessary in your view for there to be a Bivens claim? Is anything else necessary? Is that exactly the rule that you want us to adopt? Justice Kagan, the rule that we're asking this Court to adopt to avoid the anomalous result when a U.S. domestic officer on U.S. soil shoots and there's no constitutional constraints is that when there is a cross-border shooting involving a Federal law enforcement officer on U.S. soil and the resulting injury is in close proximity then Fourth Amendment constraints on that officer should apply. And – Roberts. Well, that's a test that surprisingly fits the exact facts of your case. It seems to me that the principles you're arguing for can't be so narrowly confined. And, for example, how do you analyze the case of a drone strike in Iraq where the plane is piloted from Nevada? Why wouldn't the same analysis apply in that case? Chief Justice, if it was a drone strike, I'm assuming that it was probably military. I'm assuming that there was cooperation with other governments here in our case. So if this were, in your case, somebody from the State National Guard or whatever, then there would be a different result? Well, if it was a State National Guard, I'm not sure that they would be shooting across the border, Your Honor. I mean, Chief Justice – Can you imagine a situation that is not precisely like the facts of your case where military officials may be involved? I can imagine that scenario, but that's not the purpose or the intent of this rule. The purpose and intent of our rule is simply to involve this Court in addressing an ongoing, domestic, routine law enforcement issue along our southwest border. Your brief excluded military personnel and intelligence personnel. Your brief is limited to, as you said, civilian board patrol officers. So your drone example, I take it from your brief, your answer is that's a military operation. That's right, Justice Ginsburg. And we also – Well, I understand that, but I'm trying to see what the logic is, other than that yours happened to involve a nonmilitary actor and my hypothetical involves a military actor. Under a Bivens analysis, I'm not sure that that makes a difference. Maybe there will be some defenses once you recognize the cause of action that have to do with the military operation, but I'm not sure why you wouldn't have a cause of action under your theory. Our theory is meant to address the ongoing problem along the southwest border that has resulted in at least ten cross-border shootings and six Mexican national deaths, and every time the Constitution, according to the government, turns off at the border, even though all the conduct happens in the United States. I recognize that under the military situation, there are orders that may be being followed. Here we have a rogue officer who actually is not following his own Federal regulations, which says he can't use deadly force without imminent peril. But that isn't the question. The question – the question that we – it's our problem, but we have to have your help in solving it, is you have a very sympathetic case, we write some words, and those words you're delighted with because you win. That isn't the problem. The problem is other people will read those words, and there are all kinds of things that happen, maybe military, maybe not. Perhaps a foreign country, with the collusion of people in our country, sets off the drone. That's what the Chief Justice brought in. And are we in deciding for you, A, deciding as well that anyone who suffers a drone strike can come to New York and bring a law case? Are we deciding that the matter is unclear so that when the proper authorities get advice from their lawyers over in the executive branch, they have to say we're confused? Okay? So what are the words that we write that enable you to win, which is what you want, and that avoid confusion, uncertainty, or decide these other cases the proper way? That's the question you've been given three times, and I would certainly like to know your answer. Jones, Justice Breyer, this rule does not involve a drone strike, and I do not intend to suggest that it should. This involves only the law. Breyer, we know that part. The question is what words do we write so that this opinion doesn't affect the drone strike, which is what you seem to want? Again, so the rule that we are suggesting has a close proximity element to it. It has all of the conduct of the United States, of the officer on the United States soil, shooting across the border. So we could take your test point by point and ask you whether it would apply in a situation where each of those factors was a little bit different. So your client was 15. What if he was 19? Would that be different? No, Justice Alito, of course it wouldn't be different, but the point of the rule would apply there. The rule would apply if he was 19, standing unarmed in Mexico when he was shot. All right. What if he was armed, but he had his hands up? Again, we're not asking for a win here. We're simply asking if the Constitution applies and that he can the defense of self-defense by the officer can happen at the trial court level. What if he wasn't in this culvert, but he was 200 yards beyond in Mexico? Would it be different then? It may be under the Boumediene element of nature of the site. So this culvert is unique. If the Court – I would invite the Court to look at Exhibit 180 of the Petitions Exhibit, which is an appendix, which is a picture of the culvert. And what if the officer was not standing in the United States, but actually ran a short distance across the border into Mexico? That would seem to be worse, wouldn't it? But would you say the rule would be different there? Justice Alito, it may be, because the – first, the Border Patrol agents are strictly prohibited from crossing the border, like Federales are strictly prohibited from crossing the border. Right. So suppose he violates that rule. He crosses into Mexico and then he shoots the Mexican national. Right. It may not – the rule would not apply, but it doesn't mean that under the Boumediene standards that there's not constitutional protections. Did he not know where the line was? Did he intentionally go in hot pursuit? Was he called over by a Federale? The specifics of the facts would affect the decision of whether the Constitution applied. Under our – under our proposed rule, as Mexico pointed out in its brief, there's been 243 shootings along the border, with the Border Patrol using deadly force, 10 of those across the border. I understand that, but as Justice Breyer said, we have to articulate a rule that applies. We can't just say that in – that on the particular facts here, there was – Mr. Hernandez's – the Petitioners have a Bivens claim, and it states a violation of the Fourth Amendment. We have to have a rule to – that can be applied in other cases. And I don't know what the – what rule you want us to adopt, other than to say you win. And of course, that's what you – you need to do for your client, but you need to give us a principle that is workable. Is it – is your rule that if the U.S. agent commits on foreign soil an action that would be a violation had it occurred within the United States? There is a Bivens claim and there is a Fourth Amendment violation. Is that your rule? Justice Alito, no. So our – our rule involves all of the conduct occurring on the – on the United States side, and I acknowledge a W, as Justice Breyer said, will be nice for our side. But more importantly, the Border Patrol is 44,000 strong along our southwest border, and they only interact with Mexican nationals. We've had 10 shootings across the border, so though we might get the W, it will at least not turn off the Constitution. Mr. Hilliard, it – Well, your rule would be the same if this was the first time it happened, if it was one person and the other facts were the same, right? My rule may be the same, but my response to the question wouldn't have as much meat on it, because we're here after many of these shootings have occurred, and we're here because the interaction of the Border Patrol in this area. The government has taken the position that on the border, the Constitution turns off if the deadly force goes across the border. But you – an anterior question. It has been argued that the Constitution is only for people who are within the United States. Therefore, an alien injured abroad has no Fourth or Fifth Amendment rights. How do you answer that? Well, I think that the Boumediene made clear, Justice Ginsburg, that aliens abroad have constitutional rights depending on whether or not there is a – after the evaluation, whether functionally the Constitution should apply. This Court has – That was dealing with habeas. That was dealing with habeas, but the Boumediene Court did a full survey of the entirety of the extraterritory – extraterritory cases, and they said there's a common thread. And what this Court does is it looks at where are we sending this – where are we sending the Constitution, and what are we asking it to do? And I acknowledge and recognize, and this Court has already said, it's not a worldwide Constitution, but it has gone abroad many times depending on what it needs to do and what it's being asked to do. Mr. Hilliard. I think you said what your rule is in a pretty clear way. You've said essentially it's a border area and the shot came from the United States. So that, I take it, is your rule. So it seems to me that the harder question is actually – and this goes back to the Chief Justice's question – why is that your rule? You know, what makes that confluence of factors different from everything else? Justice Kagan, the reason that's our rule is because the interaction at the border, on our southwest border, has resulted often in shots being fired across the border. It's not unique to Sergio Hernandez. Well, I guess you keep saying that, Mr. Hilliard, that there's a problem here, and I respect that. But there are problems – there might be problems in other situations as well. There might be problems when U.S. officials go into a foreign nation's territory. So that leaves me still uncertain why – I mean, you're saying as a practical matter this is where the incidents are. But is that all you have as to why this is your rule, why the border cases are different? So using the framework of Boumediene and the factors of Boumediene, and given that this is a situation on the border, the Boumediene factors are used to plug in the rule that we're asking for. For example, the Boumediene factors are nature of the site, status of the person seeking the constitutional protection, importance of the right. So those factors we plugged into this rule to address not just this specific problem, but in reliance on the Boumediene opinion, which said there's a common thread on all these cases and it's a functional application, we took the four elements of the framework of Boumediene and applied them into our rule. Well, but the one obvious difference with Boumediene is in there you were dealing with an area subject to the exclusive control of the United States. Here you're dealing with Mexico. An entirely different situation. Mr. Chief Justice, I would acknowledge that you're right. We are in – Boumediene is in Cuba, but it's a – it's basically as Boumediene recognized United States territory. Here, you have a U.S. law enforcement officer whose 100 percent of his conduct is inside the United States, to jury and to sovereign United States property. No other government could control his actions but our government. And while inside the United States, under his own constitution, which he has sworn to abide by, he shoots. You know, the hypothetical that I have may help. Well, but just to stop you there, so is it any time that the U.S. officer is in the United States that that's – that satisfies the question under Boumediene? It – no, it does not. It's because the injury occurs in a different jurisdiction, right? It's because the injury occurs in close proximity. And this is a unique area. Again, I would invite the Court to look at Exhibit 180 of the appendix, which shows this culvert does not delineate where the United States ends and where Mexico begins. Well, I assume that's true of a lot of borders. Well, and the reason that that's important in regards to the truth of that statement is because the United States exercises some degree of control into the culvert. And as Michael Fisher said in his testimony to Congress, they project outwards from the border. Does the government of the United – of Mexico agree with that? The government of Mexico agrees that their sovereign is violated when the United States shoots bullets into their land and kills their citizens. My question is whether the government of Mexico agrees with your statement that the jurisdiction of the United States extends beyond the Mexican border. Mr. Chief Justice, it was not that the jurisdiction extends beyond the border. It's that the control projects from our physical border, as Michael Fisher, the head of the Border Patrol, said, outward. It's not the first or last line of defense. The government of Mexico has not addressed his statement. But as a fact, along the entirety of the southwest border, the Border Patrol stays on the border and projects authority outward. Kagan. Kagan. Can I ask about an anomaly created by your rule? I take it everybody agrees that if there were a Texas State trooper who was involved in the exact same conduct, that trooper, you would not be able to sue that trooper. So why is it that Bivens, which is usually thought of as a more limited remedy than 1983, I mean, why should you have this situation where you can sue the Federal agent but not the State agent? Justice Kagan, in all respects, except where the victim lied, this is a typical Bivens case. You have a U.S. law enforcement officer exercising unreasonable force, and Sergio Hernandez is in the group of victims that are injured as a result of excessive force. The issue is, is where he fell and where he shot, does it take it out of his right to a Bivens? Well, I've waited while the rule was being discussed because that's important. But as Justice Kagan's questions indicate, whether or not there can and should be a Bivens action is critical to your case. Since 1988, this Court has not recognized a single Bivens action. We look for special considerations. You've indicated that there's a problem all along the border. Why doesn't that counsel us that this is one of the most sensitive areas of foreign affairs where the political branches should discuss with Mexico what the solution ought to be? It seems to me that this is an extraordinary case for us to say there's a Bivens action in light of what we've done since 1988 where we haven't created a single one. Justice Kennedy, there is no alternative remedy for the family. There has been 283 shootings, and when those shootings with the border groups were not attacked, there was no alternative remedy for the family. We're not attacking the policy of the United States government in regards to the Mexico. In fact, the policy of the United States is that Border Patrol agents should not use deadly force without imminent peril. We're asking that when it's a rogue country. Kennedy, well, the policy of the United States, I suppose we can ask them, is they're not going to give any compensation from a special bill for Congress or by an executive agreement. The policy of the United States is that this injury, a serious injury, goes unaddressed. And if we assume that the officer was completely at fault and that there's really no defense, we don't know what the facts are, but if we assume the facts most favorably to you, there should be some relief. But isn't this an urgent matter of separation of powers for us to respect the duty, the principal role that the executive and the legislative have with respect to foreign affairs? Justice Kennedy, I would say it is an urgent matter of separation of powers, but it would be the opposite. The fact pattern, if the Court may recall, is Officer Mesa had actually grabbed one of Sergio's friends and had him by the scruff of the collar next to him in the United States. Had he shot that boy, there would be a Bivens claim. If a Mexican national is shot just inside the United States and the only thing the government can say is it implicates foreign policy and national security in that situation, then you have taken away Bivens claims for the largest police force in this country in the area that they operate. The location of the boy in regards to being shot from the United States should not counsel hesitation. If the conduct of the boy is irrelevant to this case, that's what we're going to put in our opinion? You start with we start in your opinion that if all of the conduct happens inside the United States and there is a close proximity cross-border shooting, then the Fourth Amendment constraints on deadly force apply. To hold otherwise, Justice Kennedy, is to prevent Bivens in the area of the border, whether it's south or north of the line, because if national security and foreign relations is affected 30 feet across the line and an officer stands in the same place and shoots Sergio's friend right next to him, then you have one Bivens case and one non-Bivens case. Breyer, when I write the reason for that, I write the opinion just as you said it, and it says when it's only 30 feet away, the victim, then the Bivens action and the Fourth Amendment apply. But if it's 30 miles away or 300 miles, they don't. Okay? That's what you want me to write. Now, the next sentence has to have the reason why I drew that distinction, and that's what I think people have been looking for. And so just please, if there's anything else you have to say, I think you don't have anything else to say. But if you do, I would say this is a good time to say it. My point is that the close proximity takes it away from your analogy, Justice Breyer. My point is that if all the conduct does not happen inside the United States and there I had a few problems with applying it across the board. I mean, maybe I could, but is that what I'm supposed to say? Because it took away from the problems that Justice Breyer had. Now, of course, you can't say that. So what is it I can say? If I understand your question, Justice Breyer, the reason that Bivens should be allowed if all of the conduct happens in the United States is because the anonymous All the conduct happens in the United States with the drones. Right. But it would be anomalous to say that if the Border Patrol agent shoots north, west, and east, there's a Bivens claim. There's a Bivens claim. It's, with all due respect, it's not the same with the drones, because there is no proximity and there's no cross-border shooting. There's a drone that goes somewhere else to do something else. Okay. What about a different approach? And I just want your reaction, because you suggested at the end of your brief, if you have anything to add to it. Yes, all the action took place in the United States. But it took place at the border, not beyond the border. At the border. The border is the river. We have a treaty that says the river. We also have a treaty that says there will be a line down the middle of the culvert, but the culvert will be maintained by Mexico and the United States jointly. And there are many documents, including the treaty of Hercule Guitart, you know, that famous treaty, which I'm drawing a blank on. The Dalgo? Yes, right, which referred to the river as the border. So it has not taken place in a foreign country. It's taken place on territory that jurisdictionally, of course, is Mexico's, but which is a special kind of cart. You started talking about the curtilage. Is there any other word? Curtilage suggests a house. Then you started talking about cannon shots going off somewhere. So you did research into this. Now, if I want to say this is a special kind of physical place, what words do I use? I think, Justice Breyer, if I get your question in, and the middle of the river, according to the Treaty of Hidalgo, is the deepest trench of the middle of the river, and there's no river here anymore. It's simply a flat culvert, which is part of the. We are responsible for maintaining it, not by ourselves, but with Mexico. And the reason we are maintaining it is because at one time the whole river and now the line down the center are the boundary, and we don't want the river to jump its banks and create new boundaries. So this is a boundary case. Now, you obviously explored that, and then I think you gave up on it. And so I would like you to tell me what you want me to hear about it. So the curtilage cases were used in order to show that there is a substantive reasonableness evaluation in regards to the close proximity requirement of our rule. Ginsburg-Are you relying at all on, I'm not sure you did in your brief, but there in tort law generally, when there's an act outside that causes injury inside, the regulating rule can come from the place where the conduct occurred. So that act outside, injury inside, is a familiar category in tort law. And as I understand it, the regulating rule can come from either place, the place where the act occurs or the place where it's effect. That's right, Justice Ginsburg. And as a practical matter, as the Mexican jurist brief points out, there is no practical way for the courts of Mexico to review this conduct. So I appreciate, if I can get back to Justice Breyer's concern and inquiry, and that is, if all of the conduct happens in the United States, and as a fact, there is some exercise of control right at the border, then if the injury occurs in close proximity to that border, then that's a rule that would both be workable and would take care not only of the issue with Sergio Hernandez, but would also take care of the issue of the entirety of the southwest border of the United States where the conduct continues to occur, even today. Alito, to go back to Justice Kagan's question, if the officer here was a State or a local officer, would you be able to file a claim for damages in the United States in a Federal court? The issue in that regard is if what does jurisdiction mean under 1983? And if jurisdiction means if you're not a citizen and you're not in a jurisdiction, are you precluded under 1983? The point I was trying to make with Justice Breyer is there is some issue of control in the culvert, and this has never been decided what jurisdiction is in regards to the jurisdiction. Well, put that aside. Let's assume this is in Mexico, plainly in Mexico. Would you have a claim against a State or local officer? And if not, isn't it anomalous for us to say that you have a claim under Bivens? You would not have a claim under the State officer, but if you don't – but a Bivens claim, a constitutional Bivens claim could apply to the State officer. The issue of the State officer is a State officer who lives in, I guess this is Texas, right? Why couldn't the family sue that State officer under the theory that Justice Ginsburg raised, which is if all the acts happened in the United States but were projected injuries into another State, most States, I think including Texas, but I could be wrong, we have counsel for Officer Mesa to tell us the family could sue the State officer in Texas. He did the acts in Texas. He lives in Texas. That's personal, general jurisdiction. Justice Ginsburg – I mean, excuse me, Justice Sotomayor, I do not just – That's the first time I know. I apologize. Justice Sotomayor, I agree with you, but the issue under 1983 is citizenship and jurisdiction of where it occurred. If I take Justice Alito's hypothetical and put the victim all the way into Mexico, then there would be a statutory exclusion to, based on jurisdiction, if he came into the United States or was within the control area that might be jurisdiction, then there would be a 1983 claim. How often do State officers act under cover of State law outside, with an impact outside the United States? Justice Ginsburg, I've never heard of that. Generally, the interaction at the border is the Border Patrol with Mexican nationals on the south and north side of our border. It's generally the Border Patrol. If there are no other questions, I'd like to reserve the rest of my time. Thank you. Thank you, counsel. Mr. Ortega. Mr. Chief Justice, may it please the Court. The Fourth Amendment does not apply in a cross-border shooting of a Mexican civilian on Mexican soil by a United States Federal agent. The Petitioner's claim for Fourth Amendment protection was answered in Verdugo. I don't think this Court gets to the question of the functionality at test. In Verdugo, the U.S. officers were acting in collaboration with the approval and cooperation of Mexican officers. That's quite a different case, isn't it? It is. However, in Verdugo, the person claiming protection was in the United States. The act occurred in Mexico. Here we have Mr. Hernandez, who was seized in Mexico. He was never in the United States. The border is very real and it's very finite. It's not elastic. But I thought in Verdugo, the question was a search that occurred wholly inside Mexico with the cooperation of the Mexican authorities. And this Court denied to extend that protection. I believe those facts provide or provided even a greater rationale for this Court to extend those protections, given the fact that the United States planned the acts in the United States with Mr. Verdugo in the United States and the search occurring in Mexico. Here the seizure occurs in Mexico. Mr. Hernandez is in Mexico. He is outside the sovereign territory of the United States. There is no de facto jurisdiction of the culvert in this area. It's very dissimilar from Bumedian. The Bumedian had control. Who controlled the base? And here we know that this culvert, at least as far as paving it, keeping it up, spending many millions of dollars, seeing that trade, if it ever is filled with water, goes across, the ships are free, et cetera, is a joint effort of Mexico and the United States. So this is not just like a fence. It is an area of two fences, and between those two areas is joint exercise of border maintenance authority. So I guess it's like nothing I've seen before. But if it's like nothing I've seen before, what's the problem with taking Justice Ginsburg's approach and applying it to that kind of area where, I might add, 500, 1,000 people walk across it every day, and it's a fair inference that perhaps that American citizens, adolescents, play in the culvert, too? Your Honor, the culvert, if I may, is not an area where anybody plays. I have been there. It's not an area of the culvert. We have to take as a fact here that the children were playing. A jury could find to the contrary, but we have to take that as a fact. The border in that area is still finite, Your Honor. A border patrol agent cannot step into the sovereign Republic of Mexico. If he were to do that, he would be subjected to a 5-year minimum mandatory penalty for stepping into Mexico with his weapon. He was riding a bike in the culvert area, correct? The wall is on one side. He's on the Mexico side of the wall in the culvert riding his bicycle. That's American territory? Yes, Your Honor. And so the dividing line is just the overpass pillar? The dividing line is the boy at that pillar? The boy was at the pillar or behind it. The boy was at the pillar on the Mexican side. On the Mexican side. Yes, Your Honor. The dividing line isn't even marked on the ground, isn't that right? You can't tell on the ground where Mexico ends and the United States begins. I think the point that Justice Breyer is making is this does seem like a very, you know, it's a sui generis kind of case. It's this liminal area. I don't want to – I don't know whether to call it a no-man's land, but it's this liminal area which is kind of neither one thing nor another thing. So maybe it's that both countries maintain it. Maybe it's that it's sort of neither country. Whatever it is, it's something very different from most areas where we know exactly whose jurisdiction operates and how. It is very different, but it's the center of the culvert that's the dividing line. We know from Boumediene that the word sovereign and even the legal concept of sovereign, which in Boumediene belonged to Cuba, is not necessarily the line that distinguishes where the Fourth Amendment does or does not apply. But what was distinguishing in that case, Your Honor, is that we exercised control over Guantanamo. Yes, yes, correct, correct, absolutely right. And here the control is significantly diminished compared with the base at Guantanamo Absolutely correct. But the point is there are other factors, which we've heard for half an hour at least, you know, here, that, well, suggest maybe the Fourth Amendment should apply. But the United States does not exercise any de facto jurisdiction beyond the middle line. We do two things. We do at least have a commission that draws the boundary and with Mexico also repairs the culvert, and that's expensive. So we do two things with Mexico there, and the fences are on either side of the culvert, and it is a border. And all of those things taken together either are or are not enough to apply the Fourth Amendment. That's why I say add Justice Ginsburg's point and add the fact that Mexico would like the Fourth Amendment applied. They would like it applied in this case, but they have never ceded any of their jurisdiction beyond the middle of the culvert. I understand that the maintenance of the culvert is a joint maintenance. However, the laws of the United States do not apply beyond the middle of the culvert. But the law of the United States, the law is directed to an actor. The actor is the Border Patrol member, and the instruction from the United States is very clear, do not shoot, kill an unarmed, non-dangerous person who is no threat to your safety, do not shoot, kill. That's U.S. law, and that's U.S. law that governs the conduct of the Border Patrol police. So I don't understand all this about Mexico. It's the United States law operating on a United States official who is acting inside the United States. This case has, as far as the conduct is concerned, United States written all over it. There's nothing about Mexico. The Border Patrol guard doesn't take his orders from Mexico. And I think it would be up to the United States to prosecute Mr. Mesa criminally if they were to choose to do so, which would provide a remedy to the Petitioners via restitution order. Sotomayor, they wouldn't get any damages for the death of their 15-year-old son for their emotional suffering. But I think I have, following up on what Justice Ginsburg is saying, a more fundamental question, which is I don't think you or the U.S. government is suggesting that anyone is condoning people standing at the border and taking pot shots at passing Mexicans. Absolutely not. All right? And, yes, there's a remedy, criminal remedy, for the government to vindicate its position, but why should there be, not be, a civil remedy to ensure that Border Police are complying with the Constitution, the entire, either under the Fourth or Fifth Amendment? Wouldn't shooting pot shots at Mexican citizens be shocking to the conscience? It is shocking, but where would the line apply? The ad hoc totality of the circumstance test as presented by the Petitioners, would it be as far as the bullet can travel? Breyer, it would be, and that's where they use their analogy, it would apply when the action that violates the amendment takes place in the United States and where the victim is at the border, and at the border is defined as including those areas that are jointly administered as part of a border set forth in the treaty, where administration means spending significant amounts of money on the upkeep of those border positions, where, if you want some additional limitation, where both American children and Mexican children might play. And why do we do that? Because without such a rule, the people of the United States who might play there too are not secure in, from, unreasonable seizures such as this one. I mean, I made that up. But he has quite persuasive analogies in the law with curtilages, cannon shots, joint administration, and the purposes of the Fourth Amendment, which is to protect the people, we can say maybe American and maybe beyond, from unreasonable searches. Okay? There is a set of arguments. Limitation, absolute limitation, no worry about drones, flows directly from Boumediene and carries out the purposes of the Fourth Amendment. That's a whole long argument. What do you want to say? Well, Your Honor, I believe that if, even if the approach, if taken as framed by Your Honor, were to be applied, it would still plunge the lower courts into a sea of uncertainty as to where that line actually ends. I understand that your question is focused on the United States' care and upkeep of the area, and that it would end in that area. But I think the ramifications and the tentacles of such an ad hoc approach of justices Kennedy. Kennedy. Justice Ginsburg outlined all of the U.S. factors here. It was a U.S. officer in the United States subject to U.S. regulations. If we were to hold the officer liable here under Bivens, what would be the practical obstacles that would prevent orderly administration of that rule? It's a U.S. officer subject to U.S. supervision, that's it. The largest, or the most profound practical obstacle, I believe, would be the application of the rule itself and not applying or not giving lower courts a clear certainty, a clear, defined rule on which to apply, which would. Well, Mr. Ortega, the rule is very defined. If the shot comes from U.S. territory and it hits somebody in the culvert, then there is an action. That's a very defined rule. There is nothing unclear about that. You can argue, is that the good rule, is that a bad rule, is there a good reason behind that rule, but it's a very clear rule. But in areas of the United States that where there is a clearly defined border, as we have here, the Fourth Amendment stops unless the person seized, in this case Hernandez, had some voluntary contact with the United States. Roberts. Could I ask you briefly, because we haven't talked about it yet, a question on the qualified immunity point. It seems very odd to me that qualified immunity would turn on a jurisdictional issue. In most of our cases, you're interested in the conduct of the officer and whether that conduct was reasonable in light of precedents, not an issue about whether or not he can be sued by the particular plaintiff. Are you aware of any of our cases where qualified immunity turned on a legal jurisdictional issue? In other words, it's odd to say the officer's conduct is reasonable so long as it turns out the victim, you know, is Mexican, but it's unreasonable if the exact same conduct and it turns out the victim is American. I'm not aware of any qualified immunity case like that. I don't know of any case that fits that fact pattern, Mr. Chief Justice. Would you recognize that, let's say it was the boy that the Border Patrol member grabbed and then shot him, so the death would have occurred in the United States, Bivens' claim? Well, absolutely. Then he would be in the territory of the United States and all constitutional protections would apply. Ginsburg. So does it make a whole lot of sense to say if the officer shoots somebody on the U.S. side of the border, Good-Bivens' claim, if the officer standing in the same place shoots somebody who's just across the border, no claim, that doesn't make a whole lot of sense, does it? To distinguish those two victims? I think it's very distinguishable because of the very real border. Wars have been fought to establish borders. The border is very real. Thank you, counsel. Mr. Kneedler. Mr. Chief Justice, and may it please the Court. The antecedent question in this case is whether this Court should create a cause of action for damages under Bivens. As Justice Kennedy pointed out, for many years this Court has declined to extend Bivens to new contexts because out of recognition that the creation of causes of action is for Congress. You're quite right, Mr. Kneedler, but there is a difference between this case and I think all, maybe all but one of these other cases, which is in all of these others cases, the Court has been able to point to some alternative remedy. It might not have been the complete relief that a plaintiff in a case wanted, but it was something. And there was an ability to say, Congress has given you some way to address the harm that you've suffered. And here there really is nothing. I mean, there's the idea that you might prosecute this person criminally, but what does the family get from that in any way you almost never do? So here there's just no remedy, and isn't that really quite different from all these other Bivens cases that you referred to? Kneedler, First of all, the Court has made clear in Stanley and Wilkie that the presence or absence of a remedy is not the only factor. There is the additional concern. Kagan, Well, we've said that, but, you know, Stanley might be the only case on your side, and Stanley is a military case where there is, like, the ultimate special factor. So for the most part, every time we've said no Bivens, we've said because there's an alternative remedy, and here we can't say that. Kneedler, Well, when you say Stanley and Chappell v. Wallace, ultimate special factors because of the political branch's control over the military, that is directly applicable here. Here you have a cross-border incident which necessarily gives rise to foreign relations problems which are committed to the political branches. And when Congress has chosen to address remedies as a statutory matter under the Federal Tort Claims Act, it has created an exception for injuries occurring in foreign countries. And in response to Justice Ginsburg's question, as a matter of Federal law under the FTCA, under this Court's Sosa decision, if the injury occurs outside the United States, it is excluded from liability even if the conduct occurred in the United States. Ginsburg. But for U.S. liability, not the officer liability. Kneedler. No, but I think if the Court is considering whether to fashion a judicially created remedy looking to what Congress has done where it has acted, and 1983 is another very prime example, and where Congress has chosen to create monetary compensation for persons injured abroad by the United States, it has always done it in an administrative manner. Breyer. Why do you use words like create, extend, et cetera, fashion, if, in fact, a Federal policeman, a Federal agent, violates the Fourth Amendment and seizes someone unreasonably in Alaska, does the victim have a Bivens remedy? Yes, but the question is. Is it in Puerto Rico? Does the victim have a Bivens remedy? I'll tell you by making this up, but there never has been a Bivens action in Puerto Rico. It's the first one. Does he have a Bivens action? Kneedler. Yes, but there's something fundamentally different about creating a Bivens remedy for extra territory. Breyer. Well, why creating? I would have thought if you want to say there are, wait, extending. You see, those words assume the answer to the question. I can absolutely see you're saying that if this Court fashions a civil remedy for a violation of the Third Amendment or the Second Amendment, you would be extending Bivens. But I thought Bivens made absolutely clear that where a Federal agent hurts someone by violating the Fourth Amendment, there is a Bivens action. Now, we have an exception, and the exception is the military. So I think you can look at this either way. I think the more you do, I would tend to look at it as saying, of course there is a Bivens remedy if there is a Fourth Amendment violation, unless you're in the military, which no one says this is true. So that's how I've been thinking about the Bivens action. I've been thinking the answer to that question turns on the answer to the Fourth Amendment question. Now, you can tell me why it's better to use the words you've been using. Kneedlerer No. The Court, just because the Court has recognized a Bivens action for violation of a particular constitutional provision in one context or with respect to one set of defendants, it doesn't mean that it should extend it. And that's the word the Court has used. Breyer, in Puerto Rico? Kneedlerer Well, no, under the Eighth Amendment, in Carlson v. Green, the Court recognized a Bivens remedy against Federal employees. Breyer, that's Eighth v. Fourth. I'm saying it's Fourth in Puerto Rico. Kneedlerer No. My point about the Eighth Amendment is that the Court declined to recognize a Bivens remedy for Eighth Amendment violations against private companies. Kagan You get the point. The point is that it's the heartland of Bivens for a law enforcement officer to use deadly force in violation of the Fourth Amendment. That's the heartland of Bivens. We don't have to make up anything new. We don't have to extend it. We don't have to create anything. That's just Bivens. Kneedlerer It is the heartland of Bivens' special factors analysis for the Court to create a damage remedy in a situation fraught with foreign relations issues. And this ties directly into your point about the Fourth Amendment. Kagan So let's talk about that. How is this fraught with foreign relations issues? Because Mexico would surely prefer that its citizens have a Bivens remedy. So you seem to be using foreign relations as if sort of this touches some other country. But in the usual case, I think we've asked, what's the interference, what's the disruption? So tell me what the interference or the disruption is, the problem we would create. It's not just the fact that it has something to do with another country. Kneedlerer Any time the officers of one country injure someone in another country, that creates the potential for a foreign relations incident, and it's illustrated here by a number of factors. Mexico requested the extradition of Mesa in this case, and the United States refused because it had done its own investigation of this incident and concluded that that prosecution should not be brought. Kagan I'm sure Mexico cared a lot about this. The question I'm asking is, how does the presence of the Bivens remedy disrupt or interfere with the United States' ability to carry out its foreign policy? Kneedlerer Another illustration, and I think it's tied to that, is one of the reasons is that why there is not a remedy in Mexico is because Mexico would recognize the official immunity of Officer Mesa in this circumstance. According to the amicus briefs, I have no reason to disagree with that. That is a recognition by Mexico itself that the conduct of a U.S. officer in these circumstances involves foreign sovereign problems. And another issue here is that the plaintiff here is seeking to insert the courts into the resolution of a dispute about which the United States and Mexico have a different view of the facts. And as you say, there is no remedy in Mexico. Ginsburg Suppose the victim, same location across the border, but were a U.S. citizen. As Justice Breyer mentioned, many, many transgents who go across from Juarez to El Paso. Suppose it had been a U.S. citizen that was the victim of this shooting. Kneedlerer We think there would not be a Bivens remedy there either because of the extraterritorial application system. Ginsburg And then if it were, if it were, the young man who was grabbed by the Border Patrol guard and shot on the U.S. side, Bivens? Kneedlerer Yes, there would be. But in terms of the questions about line drawing that were raised before, the two nations have drawn a line here. And this is a circumstance where the conduct here is clearly extraterritorial. The fact that there may be joint maintenance of the culvert is a very minor factor considering that the only law that governs it. Breyer That's the point. If, in fact, all that mattered were the existence of a well-recognized boundary line, this case is over. You win. But that well-recognized boundary line was present in Boumediene. And certainly, Boumediene suggests, while it is a factor, it is not the only factor that determines the reach of the Fourth Amendment. So there we are. We are in court because it is not the only factor. And now you add in all this stuff about the culvert and who's playing there and who might be playing there and the 500,000 people who cross every day and the joint maintenance of the culvert and the fact that all this conduct happened in the United States, that's what your opponent brother over there is trying to do. Kneedlerer Boumediene had to do with the substantive application of the Fourth Amendment, which I want to get to in just a minute. But the antecedent question is whether this Court should answer those questions in a private damage remedy when it hasn't recognized a new context for one in 35 years. Alito What would the government of Mexico say if we wrote an opinion that says because the United States spent a lot of money to pave this culvert, we think that the United States' authority with respect to the culvert is basically the same as the authority that we have in Guantanamo? Kneedlerer Boumediene I think the Mexican government would be very offended by that. Kagan I'm sure it wouldn't have to be written that way. Kneedlerer Boumediene This case no, but this case is fundamentally different than Boumediene. In Boumediene, the Court said that the United States is not answerable to anyone else. Here the United States is answerable to Mexico. In Boumediene, the Court said only Ginsburg You did say in your brief the United States is answerable to Mexico for any cross-border use of force. How is the United States answerable to Mexico? Kneedlerer Boumediene Mexico holds us accountable for doing something about it. We investigated criminally and concluded that a criminal prosecution should not be brought, but Mexico regards it as the United States' responsibility to control this conduct. Ginsburg The answerability to Mexico is a prosecution in the United States? That's Kneedlerer Boumediene To control the conduct, yes. And let me just reemphasize that where Congress has decided that damage remedies are important, it has never provided for judicial remedies. It has provided for administrative remedies, and it has not done it in this context. Kennedy You wanted to talk about the Fourth Amendment? Kneedlerer Boumediene Yes. This Court's decision in Verdugo, as we read it, established a categorical rule that the Fourth Amendment does not apply to some mass of persons outside the United States. Nothing in Boumediene changes that. Boumediene, looking at the Insular Cases and whatnot, was talking about territory over which the United States exercised jurisdiction, independent of the incident that was at issue there.  Sotomayor Mr. Kneedlerer, would you go back to my hypothetical? Border policemen are shooting indiscriminately from within the United States across the border. This is the allegation in this complaint, and I understand you say the government has investigated and sees the facts differently. Have you seen the film that appeared on the YouTube? Kneedlerer Boumediene I have. Sotomayor I did, and I can't square the police officer's account of this incident with that film. Kneedlerer Boumediene There were other videos, the press release, nothing in the record and nothing in a public account. Sotomayor That's fine. I'm just curious. Kneedlerer Boumediene But there were other evidence and other videos, surveillance videos, that were taken into account in the investigation. If I could. Kennedy Let me ask one other question. Are there examples in the past 10 years of the Congress of the United States passing special laws for to compensate victims for instances somewhat like this where the there have been private bills, but that would be the solution? This is something that should be up to Congress. And again, on the application of the courts, I guess you could say that with reference to Bivens Acts generally, even in the United States. Kneedlerer Boumediene Well, and this Court in deciding whether to apply Bivens has looked to the question of whether Congress is the right body to decide rather than the courts. And here we think it clearly is because of the foreign relations implications, not to mention the deeply rooted presumption against extraterritoriality, all the more so with respect to this Court's creation of a cause of action. Ginsburg As far as foreign relations are concerned, at least justice of this Court has said that the behavior of our law enforcement agents abroad sends a powerful message about the rule of law to individuals everywhere. And you are asking us to make a distinction that if the law enforcement agent shoots and kills somebody who's on one side of the border, there is Bivens liability, you told me that, if it's just on the other side, although the conduct is identical, the officer is standing in exactly the same place. I don't know what kind of powerful message about the rule of law that would send. Kneedlerer Boumediene Well, Bivens has to do with a particular remedy and who should create that remedy. The rule of law can be enforced and demonstrated in other ways, by discipline, by the border patrols. Ginsburg But it doesn't happen, we know that. Kneedlerer Boumediene No, the border patrol, since this incident, and we cite this in our brief, has undertaken numerous reforms. It has changed its training. It has given more detailed instructions on the use of deadly force. It has adopted, and this does go to the rule of law, adopted a transparent system of investigations after an incident. Kagan If the border control agent stood where he stood and took the shot he did, and the only difference was that the teenager in the culvert was an American citizen, is there a Bivens action? Kneedlerer Boumediene We think there would not be, but that's obviously a different question than whether an alien should have a cause of action given 1983 and Congress's action in this area, which indicates a judicial remedy, should not be available. Roberts Thank you, counsel. Mr. Hilliard, you have a minute left. Hilliard Thank you, Mr. Chief Justice. To Justice Ginsburg's hypothetical, both of my friends on the other side have now said there's a Bivens claim for the boy who shot next to the officer. Take that position into this hypothetical. The officer shoots the bullet, shoots the gun, the bullet leaves the gun. It's constitutionally – there's constitutional consequences as the bullet travels all the way to the border. If there's a bullet between the bullet, I mean the gun, and Sergio, and that bullet goes through that boy in the U.S., and then the same bullet hits Sergio, their position is that there's a Bivens claim and there's a constitutional constraint as to the first boy who dies, but not the second boy that dies. The conduct occurring in the United States, 100 percent of it, if it gives a Bivens claim, if it gives a normal standard Bivens claim to the boy who shot somewhere with the bullet and then does not give one to Sergio Hernandez, ends up being anomalous. As to Justice Kennedy's question on the Fourth Amendment, Boumediene decided that it is a functional test. It's a question of judgment, not compulsion, as Justice Harlan said in Reed and as Boumediene suggested. Verdugo has nothing to do with the application of the seizure by shooting someone dead to the search inside the property. I think Boumediene confirms that the fact pattern of someone being killed is enough in a practical way to provide limited constraints. Thank you very much. Roberts. Thank you, counsel. The case is submitted.